**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

BILLIE MARIE CROWNOVER,                    )
PERSONAL REPRESENTATIVE OF THE  )
ESTATE OF FRANK JAMES                      )
CROWNOVER,                                 )
                                           )
          Plaintiff,                   )
                                           )
v.                                         )          **Case No. 08-CV-020-JHP-PJC**
                                           )
BOARD OF COUNTY COMMISSIONERS  )
OF OTTAWA COUNTY, OKLAHOMA;         )
TERRY DURBOROW, Individually and in   )
his official capacity as Ottawa County       )
Sheriff; DENNIS KING, Individually;         )
RANDALL LLOYD, Individually,             )
                                           )
          Defendants.                  )

## OPINION AND ORDER

Before the Court are Defendant Terry Durborow's Motion For Summary Judgment, [Doc.

No. 59], Defendant Board of County Commissioners of Ottawa County's Motion for Summary

Judgment, [Doc. No. 57], Defendant Dennis King's Motion For Summary Judgment [Doc. No. 58],

and Defendant Randall Lloyd's Motion for Summary Judgment [Doc. No. 60].[1] Also before the

Court is Plaintiff's Response To Defendants' Motions For Summary Judgment [Doc. No. 80],

Defendants' Reply To Plaintiff's Response [Doc. No. 88], and Plaintiff's Surreply [Doc. No. 94].

For the reasons stated herein, this Court hereby **GRANTS** the summary judgment motions as to each

of the Defendants.

---

[1]The Defendants also filed Errata/Correction Motions to correct documents which were filed as exhibits to the Defendants' summary judgment motions which included unredacted personal identifiers. See Doc. Nos. 61, 62, 63, 65, and 66.

## UNDISPUTED FACTS

Frank Crownover was arrested on January 4, 2006, after the Ottawa County Sheriff's office was notified of a warrant for his arrest by the Buchanan County, Missouri District Attorney's Office regarding unpaid child support. When Crownover was booked into the jail, the jailer on duty asked him about his current medications and any current medical conditions. Crownover told the jailer that he had asthma, heart trouble, mental illness, hepatitis, high blood pressure, skin disease and that he was suicidal. [Doc. No. 60-3, pg.14] He stated he was a patient at the Grand Lake Mental Health facility and that he was disabled. He was also taking a number of medications including anti-depressant and anti-psychotic medications. Once he completed his initial intake, the jailer called Randall Lloyd, the Jail Administrator, and advised him that Crownover was suicidal. Lloyd advised the jailer to place Crownover in a "suicide smock" and then place him on suicide watch. Crownover was placed on suicide watch which consisted of being placed in a smock in a holding cell where he was monitored every 15 minutes. [Doc. No. 60-3, pgs. 14-20] The holding cell had no furniture. Crownover began complaining that, due to his back problems, he needed a chair. His request was initially denied since he was on suicide watch. [Doc. No. 60-3, pg. 20] However, on January 5, 2009, Lloyd spoke with the jail nurse who approved Crownover a bed mat to sleep on. On January 6, 2006, Crownover was taken to see Theresa Horn, the jail nurse, for an evaluation. [Doc. No. 60-3, pg. 22] Nurse Horn spoke with Crownover who stated he was no longer suicidal and did not have any more suicidal thoughts.[2] [Doc. No. 60-3, pg. 22] She observed he was in "very good spirits,"

---

[2]Plaintiff disputes some of the statements Defendants claim Crownover made to the jail nurse including statements that his depression stemmed from his back injury and that he was fine as long as he took his medication. Plaintiff claims that these statements were not recorded by the nurse in her nursing notes at the time she met with Crownover and that these statements are only recorded in her written statements after Crownover's death. The Court, in reviewing the facts in

was laughing and talking about various things. [Doc. No. 60-3, pg. 22] After her evaluation, Nurse Horn made the decision to take Crownover off of suicide watch. Due to Crownover's back pain he requested a cell where he could be on the bottom bunk. The only cell available where that accommodation could be met was in the A-pod.[3] As such, he was placed in a handicap accessible cell by himself where he could have easy access to the sink, toilet, and bottom bunk. Although Crownover had complained about being placed in the holding cell while on suicide watch, he did not complain about being housed in the handicap cell in the A pod.

On January 13, 2006, Crownover requested to see Nurse Horn and was escorted to her office. He reported having digestive problems at which time Nurse Horn scheduled an appointment for him to see the jail physician on January 18, 2006. Nurse Horn told him to notify her if his medications stopped working or if he had any other problems. She observed that he did not appear to be depressed at that time. [Doc. No. 60, pg. 9; Doc. No. 80, pg. 10]

On January 15, 2006, the jailers on duty were conducting hourly visual sight checks of the inmates. A sight check was performed at 8:00 p.m. At approximately 8:20 p.m. the jail dispatcher received an intercom message that someone in A pod needed medical attention. The dispatcher immediately notified the jailers. When the jailers arrived at A pod they found Crownover laying in a pool of blood near a shower wall. An ambulance quickly arrived and transported Crownover to

the light most favorable to the non-moving party, will only consider the statements which the nurse recorded in her nursing notes prior to Crownover's death which the Plaintiff does not dispute.

[3]The A pod is generally a protective custody pod. Inmates are placed in A pod because they cannot be placed in the other areas. Inmates charged with sex related crimes, who have problems with other inmates, or who are physically unable to be in other pods, are generally placed in A pod. [Doc. No. 60, pg. 9]

a Hospital in Miami, Oklahoma. He was subsequently transferred via helicopter to a hospital in Joplin, Missouri, where he was pronounced dead.

Following the incident, the Sheriff's department conducted an investigation which included interviewing numerous inmates who directly witnessed the altercation. The inmates stated that Crownover's injuries were the result of an altercation which "suddenly erupted" between Crownover and another inmate who was being housed in the A pod for his own protection due to the fact he had been charged with a sexual offense. [Doc. No. 60, pg. 12; Doc. No. 80, pg. 16; Doc. No. 60-8] Neither Lloyd, the Jail Administrator, nor Terry Durborow, nor any of the detention officers had any knowledge of any prior altercations between Crownover and Charles Bowes, the other inmate involved in the incident. [Doc. No. 60, pg. 12; Doc. No. 80, pg. 16; Doc. No. 60-8; Doc. No. 60-3] They also had no knowledge that any altercation between the two inmates would be forthcoming. [Doc. No. 60, pg. 12; Doc. No. 80, pg. 16; Doc. No. 60-8; Doc. No. 60-3] Crownover did not complain to any of the jailers that he felt threatened by Bowes or any of the other inmates in A pod.

### PROCEDURAL HISTORY

On January 14, 2008, the Plaintiff, Billie Marie Crownover, the decedent's wife, filed this action as personal representative of the Estate of Frank James Crownover, naming as Defendants, the Board of County Commissioners of Ottawa County, Terry Durborow in his individual and in his official capacity as Ottawa County Sheriff, and Dennis King, Randall Lloyd, Lewis Blunk and John Dalgarn individually. Terry Durborow was the undersheriff at the time of Crownover's incarceration and is the current sheriff of Ottawa County. Randall Lloyd was the Ottawa County sheriff at the time of this incident and Lewis Blunk and John Dalgarn were jailers at the Ottawa County Jail the night of Crownover's death.

On August 25, 2009, the parties filed a Stipulation of Dismissal dismissing John Dalgarn from this litigation. Then on September 8, 2009, the parties filed a second Stipulation of Dismissal dismissing Lewis Blunk from the litigation. On September 14, 2009, the Defendants filed the current motions for summary judgment.

## DISCUSSION

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999). The presence of a genuine issue of material fact defeats the motion. An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id*. at 249.

## I.    DELIBERATE INDIFFERENCE CLAIMS

Plaintiff claims that Defendants Durborow, King, Lloyd, and the Board of County Commissioners of Ottawa County (hereinafter the "Board") are liable under 42 U.S.C. §1983 because they had knowledge that the conditions of Crownover's confinement and the failure to properly train the jail staff created an unreasonable risk to his safety and, in particular, put him at a heightened risk to be subjected to violence from other inmates. Plaintiff claims that, despite the knowledge of the risk to Crownover, the Defendant failed provide a safe environment for him.

Plaintiff alleges the actions and/or inactions by the Defendants rise to the level of deliberate indifference to Crownover's safety and that the Defendants violated Crownover's clearly established right to be free from punishment as a pretrial detainee as guarded by the Fourteenth Amendment.

At the time of Crownover's death he was a pretrial detainee. The Eighth Amendment to the United States Constitution applies only after an adjudication of guilt and does not apply directly to pretrial detainees like Crownover. Nevertheless, the Supreme Court and the Tenth Circuit have held that the Eighth Amendment's protections apply to pretrial detainees through the due process clause of the Fourteenth Amendment. See *Winton v. Bd. of Comm'rs of Tulsa County, Oklahoma*, 88 F.Supp.2d 1247, 1257. "The Fourteenth Amendment due process rights of a pretrial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner." *Id.* (*citing Bell v. Wolfish*, 441 U.S. 520, 535-37, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Lopez v. LeMaster,* 172 F.3d 756, 759 n. 2 (10th Cir.1999); *Garcia v. Salt Lake County,* 768 F.2d 303, 307 (10th Cir.1985); and *Barrie v. Grand County, Utah,* 119 F.3d 862, 867 (10th Cir.1997) Thus, if Plaintiff can establish a violation of the Eighth Amendment, then Plaintiff can establish that Crownover's Fourteenth Amendment rights, as a pretrial detainee, have been violated.

The Courts have made clear that the "Constitution does not mandate comfortable prisons, but it does prohibit inhumane prisons." *Winton*, 88 F.Supp.2d at 1257. "At a minimum, the Eighth Amendment requires prison officials to provide adequate food, clothing, shelter and medical care." *Id.* "Prison officials must also take reasonable measures to guarantee the safety of inmates." *Id.* In this case, Plaintiff is alleging prison officials failed to protect Crownover from violence at the hands of other prisoners. *See Farmer v. Brennan,* 511 U.S. 825, 832-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Supreme Court has held that being violently assaulted in prison is not "part of the

penalty that criminal offenders pay for their offenses against society." *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). *See also Ramos v. Lamm,* 639 F.2d 559, 572 (10th Cir.1980). However, "[i]t is not ... every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970.

In *Farmer,* the United States Supreme Court applied the general elements of an Eighth Amendment claim in a factual context similar to the one presented by this case. There, the Court held prison officials violated the Eighth Amendment only when two requirements are met. First, the alleged deprivation must be "sufficiently serious" under an objective standard. *Id*. at 834. "In cases involving a failure to prevent harm, this means that the prisoner must show that the conditions of his incarceration present an objective 'substantial risk of serious harm.'" *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008)(quoting *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970). "Second, the prisoner must show that prison officials had subjective knowledge of the risk of harm. In other words, an official 'must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id*. (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.) In this case, Plaintiff has not shown that the Defendants were deliberately indifferent to Crownover's safety.

### A.    As Applied To The Board Of County Commissioners

The deliberate indifference standard for individuals is the same standard to be applied to the Board on Plaintiff's claims regarding the conditions of his confinement and the alleged failure to train and/or supervise jail staff. The standard is, however, applied differently to governmental entities in two very significant respects. "First, the causation standard for governmental entities is

articulated differently." *Winton*, 88 F.2upp.2d at 1262. "Second, as applied to an individual prison official, *Farmer* instructs that the deliberate indifference standard is a subjective standard requiring actual knowledge of a risk by the official." *Id.* When addressing the Board's liability, "deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the governmental entity should have known of it." *Id.* (citing *Barney v. Pulsipher,* 143 F.3d 1299, 1308 n. 5 (10th Cir.1998); *Farmer,* 511 U.S. at 840-42, 114 S.Ct. 1970 (discussing *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). "A governmental entity cannot absolutely guarantee the safety of those it incarcerates." *Winton*, 88 F.Supp.2d at 1262. Nonetheless, "governmental entities have a constitutional duty under the Eighth Amendment to take reasonable steps to protect a prisoner's safety and bodily integrity." *Id.* (Citing *Berry,* 900 F.2d at 1499.)

Where, as here, when the defendant is a local government entity, the defendant must be sued only for its own unconstitutional policies, and not merely for the acts of its employees. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Liability under § 1983 cannot be based on a *respondeat superior* theory. *Id.* Thus, to hold a governmental entity liable under § 1983, a plaintiff must establish that "(1) he has been deprived of a constitutionally protected right, and (2) that a governmental policy or custom was the moving force behind the constitutional deprivation." *Id. (*Citing *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *City of Canton,* 489 U.S. at 385, 109 S.Ct. 1197; *Myers v. Oklahoma County Board of County Commissioners,* 151 F.3d 1313, 1317 (10th Cir.1998)).

Defendant contends that even if the Plaintiff can prove a violation of Crownover's constitutional rights, Plaintiff still cannot prevail on her claims against the Board because she cannot show that any official policy of or established custom of the Board resulted in the alleged violation

of Crownover's constitutional rights. Plaintiff contends that the Board had final policymaking authority through its control of the jail funding and therefore was responsible for the policies and practices of the jail that allegedly led to this incident.

Oklahoma law clearly sets out the roles of the Sheriff and the Board. See 19 O.S. §§339, 513, and 547. "Under Oklahoma law, the Board has no statutory duty to hire, train, supervise, or discipline the county sheriffs or their deputies." *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988). "Consequently, unless the Commissioners voluntarily undertook responsibility for hiring or supervising county law enforcement officers, which is not alleged, they were not 'affirmatively linked' with the alleged [constitutional deprivation]." *Id.*

The Plaintiff has failed to provide any evidence that the Board assumed any responsibility for running the jail or for the training and/or supervision of jail employees. Plaintiff merely claims that since the Board has oversight and decision making authority regarding funding decisions it therefore, has control over the jail policies. Alternatively, the Plaintiff alleges that the policies and conditions at the jail that allegedly caused Crownover's death, were so wide-spread that the Board had knowledge of these policies and conditions, but showed deliberate indifference to them.

Plaintiff, however, fails to show that "the purported need for [corrective action] was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [Board] was deliberately indifferent to the need." *Meade*, 841 F.2d at 1528 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)) (internal quotations omitted); *see also Hinton*, 997 F.2d at 782. In this case the Board had no duty to take corrective action against any alleged errors because the Board wholly lacks the authority to do so since decision making authority, rests with the Sheriff. Thus, "[t]he failure to do so cannot represent an unconstitutional municipal policy or custom." *See*

*Foti v. County of San Mateo*, 90 Fed. Appx. 488, 491 (9th Cir. 2003). Therefore, the §1983 claims

against the Board for are hereby **DISMISSED**.

**B.**    **As Applied To Defendants King, Durborow, and Randall**

Plaintiff has also brought claims against Terry Durborow, individually and in his officially

capacity as Ottawa County Sheriff, Dennis King, individually, and Randall Lloyd, individually.

Plaintiff alleges that several conditions in the Ottawa County Jail combined to pose a substantial risk

of harm to Crownover.  Specifically, Plaintiff alleges (1) that the jail failed to properly classify and

separate mentally ill prisoners, (2) that the jail had inadequate staffing to properly supervise

prisoners, and was chronically overcrowded, and (3) that the jail failed to properly train and

supervise its staff.

1.    Failure to Classify and Separate Mentally Ill Prisoners

Plaintiff contends that the Defendants failed to comply with various Oklahoma Jail Standards

which requires separation of mentally ill inmates among other things.  Oklahoma Jail Standard

310:670-5-5 states:

> **Classification and Segregation:**
> The facility administration shall develop and implement written
> policies and procedures for the classification and segregation of
> prisoners.  The classification plan shall ensure the safety of prisoners
> and staff.    The following criteria shall ensure an adequate
> classification and reclassification system:
> . . .
> (6) Prisoners who are mentally ill shall be separated from other
> prisoners.  Every effort shall be made to contact a local hospital,
> clinic, or mental health facility for the detention of the mentally ill.
> [Doc. No. 81-4]

The Ottawa County Jail also had more specific procedures regarding how to classify and

house inmates, and what steps must be taken when a person with a "serious mental problem" begins

to experience problems or needs special assistance. The jail policy details procedures for inmates requests for counseling or other services, referrals if a jailer or other staff member notices an inmate exhibiting certain behaviors or symptoms, orders that must be followed if given from the jail nurse or shift supervisor regarding mental health care, and suicidal precautions. [Doc. No. 60-8, pgs. 72-73] When Crownover was booked into the jail he told the jailer that he was suicidal and that he suffered from a mental illness. After his initial evaluation, a jailer segregated Crownover from the general population and placed him in a holding cell where he could be evaluated every 15 minutes under a "suicide watch". The record indicates that Crownover was placed in this separate cell away from other prisoners, under constant observation for nearly 48 hours, until he was seen by the jail nurse. When Crownover was seen by the jail nurse on January 6, 2006, he told her that he was no longer suicidal. After her conversations with him and her evaluations of his mood and demeanor, the jail nurse determined that Crownover was capable of being placed in a cell that was not under constant supervision by jail staff. However, Crownover was still moved to a cell where he was the only occupant; thus, he was still separated from the other prisoners. He was, however, granted the privilege of joining the other prisoners during certain times of the day in the common areas of the prison. At no time during Crownover's confinement, other than his initial statements at booking, did the jailers report Crownover to be a threat to himself or others. In the jail nurse's meetings with him she noted that he seemed to be laughing and had no complaints. On January 13, 2006, Crownover asked to see the jail nurse regarding stomach problems indicating that if he felt that he needed to be seen by a physician or a medical professional for his mental health concerns, he knew how to contact the nurse and knew how to set up an appointment with the physician.

There is nothing in the record to indicate to this Court that the jail staff knew Crownover had

a mental illness such that it would pose a danger to himself or others, appreciated the risk that allowing him to spend time with the general population would cause, and then were deliberately indifferent to his mental condition and the risks associated with it. In fact, the jail staff were cautious in placing Crownover on suicide watch based on his initial statements and even refused to provide him furniture to sit on while on suicide watch for fear that he would harm himself. They then placed him in a cell by himself only after assurances from Crownover himself that he was no longer suicidal and after an evaluation by the jail medical staff. These are hardly the actions of a staff that was deliberately indifferent to the welfare and safety of this inmate.

Plaintiff relies heavily on the Oklahoma Jail Standard requiring separation of inmates as the basis of their argument that, had the jail staff complied with regulation and separated Crownover from the other inmates, he would have never been involved in the dispute with Bowes that ended his life. The Plaintiff also cites several other Oklahoma Jail Standards which she claims the Defendants violated. While the Court has reviewed these standards and Plaintiff's evidence regarding the alleged violations of these standards, the failure to comply with a state law or regulation such as jail standards is not a constitutional violation[4]. *Estate of Hocker by Hocker v. Walsh*, 1993 WL 664646, *9 (W.D. Okl. 1993); *see also Barber v. City of Salem, Ohio*, 953 F.2d 232, 239, 240 (6th Cir.1992); *Danese v. Asman,* 875 F.2d 1239, 1245 n. 5 (6th Cir.1989), *cert. denied,* 494 U.S. 1027 (1990).

Plaintiff has failed to show that these Defendants' conduct was in violation of Crownover's

---

[4]In *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454,461-463 (1989), the Supreme Court recognized that state laws or regulations may create enforceable liberty interests in prison privileges, such as visitation and earned credits. Such a liberty interest is created when regulations contain explicit mandatory language specifically limiting the discretion of prison officials. This is not a case involving these types of privileges.

constitutional rights.

2.     Inadequate Staffing/ Overcrowding

The Plaintiff also provides evidence that the Ottawa county jail had received several citations from the Oklahoma jail inspector prior to Crownover's death regarding the jail's overcrowding. Plaintiff contends that the jail was overcrowded on the day of Crownover's death. Plaintiff alleges that because the jail had been overcrowded in the past, the Defendants knew overcrowding was a problem and that inmates who are kept in an overcrowded jail are more susceptible to violence. Plaintiff contends that despite this known risk, Crownover was still placed in an area of the jail where he was not completely separated from other prisoners and eventually lost his life as a result of the Defendant's deliberate indifference to the risk created by the overcrowding. Defendants contend the jail was not overcrowded on the night of Crownover's death and in the alternative, the alleged overcrowding played no part in Crownover's death.

In determining whether overcrowding violates a Constitutional right, the Court must not simply look to the fact of overcrowding, but rather the aggregate effect. *See generally Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). A prison may be overcrowded but because of other factors, may not be so overcrowded as to be intolerable or inhumane. Looking at the facts in the light most favorable to the Plaintiff, this Court must conclude that A pod was at least in some respects overcrowded. The Plaintiff's facts contend that records indicate A pod, at the time of Crownover's death, housed 24 inmates, excluding Crownover. A pod has 11 two person cells. At least two of the A pod inmates (Crownover and another inmate) were housed in a cell by themselves, leaving 23 inmates to share nine cells. This means several of the cells were occupied by an additional inmate.

Plaintiff cites the Court's holding in *Winton* in support of his proposition that overcrowding is a "catalyst for inmate violence." [Doc. No. 80, pg. 41] However, the inmate in *Winton* was attacked after being held in a cell that was so overcrowded inmates were being required to sleep on mats on the floor. Crownover's situation was different entirely. Although five of the cells reportedly held a third person, Crownover was held in a cell by himself. He was even held in a handicap cell which is reported to be larger than standard cells. Although Crownover spent time in the common areas with the other A pod inmates which included three more inmates than the cells were designed to hold,[5] this was, if anything, a minor inconvenience while in the open common areas. Mere discomfort which poses no risk to health and safety does not implicate the Eighth Amendment. *See Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Whitnack v. Douglas County,* 16 F.3d 954, 958 (8th Cir.1994).

The Plaintiff also claims that the jail was understaffed the night Crownover was killed. The Plaintiff contends the Defendants knew the jail was insufficiently staffed which posed a safety risk to the prisoners and failed to take steps to remedy the situation. There is disagreement between the parties over whether the jail was staffed in compliance with Oklahoma Jail Standard 310:670-5-3 which states:

> **Supervision of Prisoners.**
> (B) Staff shall provide twenty-four (24) hour supervision of prisoners.
> © Jailer posts shall be located and staffed to monitor all prisoner activity either physically or electronically and close enough to the living areas to respond immediately to calls for assistance, and to respond to emergency situations.

---

[5]Although there were five extra people placed in cells in the A pod, there were two cells which only housed one person. Had Crownover and the other inmate who was housed alone had a cellmate, the "extra" inmates would have been reduced to three.

(D) There shall be sufficient staff to perform all assigned functions related to security, custody, and supervision of prisoners.

(2) Facilities which house more than twenty (20) prisoners shall have on site one (1) dispatcher or control center operator and a minimum or two jailers on the premises.

Defendants contend that they were in compliance with this regulation because on the night of Crownover's death they had one dispatcher and two jailers on the premises. Plaintiff contends that the regulation states these numbers are only a minimum and that the staff present was insufficient to "perform all assigned functions related to security, custody, and supervision of prisoners." However, when reviewing the record, the undisputed facts (as set forth in Plaintiff's response brief) are that hourly sight checks were performed and that the dispatcher received an intercom message that someone in A pod needed medical assistance. Immediately thereafter the dispatcher notified the jailers who found Crownover injured. The jailers then promptly instructed the dispatcher to call an ambulance which arrived promptly.

Although the Plaintiff presents evidence that the jail had received pervious violation notifications from the Oklahoma State Department of Health citing insufficient staffing of the jail, an inspector investigated the incident regarding Crownover and issued no citations and noted "no deliberate deficiencies." [Doc. No. 80-10] Further, Plaintiff has failed to show how Defendants' alleged failure to properly staff the jail *caused* Crownover's death. The record indicates the staff promptly responded to the distress call and provided Crownover medical care as quickly as possible. Plaintiff contends that the dispatcher was either unable to see the altercation from his location or was not looking at the time of altercation. However, even assuming a staff member had been watching the jailer at all times from the dispatch tower and had seen the altercation at the time it was

occurring, the dispatcher would have still had to go through the same procedure of calling a jailer to respond and the jailer would have to call an ambulance, which is exactly what happened in this circumstance. There is no indication in the record that there was an undue delay in obtaining medical care due to under staffing or that Crownover's life would have been spared but for the under staffing in the jail. According to the witness statements the altercation escalated relatively quickly and medical care was rendered promptly by the jailers. As such, plaintiff has failed to show that the jail staff was deliberately indifferent to the well being of the inmates based on the overcrowding or under staffing of the jail.

Plaintiff relies on *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999) in support of the proposition an understaffed jail can create a dangerous situation for inmates. However, *Lopez* is distinguishable from this case. In *Lopez*, there was testimony from one of the jailers stating that he was often the only jailer on duty at the jail. *Id*. at 760. There had also been at least one other violent attack at the jail prior to the incident in *Lopez* which would have put the jail on notice of the likelihood of dangerous assaults. *Id*. That is not the case here. *Lopez* is also factually distinguishable because in *Lopez*, the Plaintiff inmate was assaulted *after* the jail staff had knowledge that he was being threatened by other inmates yet the staff did nothing to protect him from those threats.

Therefore, Plaintiff's claims fail.

3.  Failure To Properly Supervise

Plaintiff has brought this claim against King and Lloyd in their individual capacities and against Durborow in both his individual and official capacity as the current sheriff of Ottawa County. At the time of Crownover's death, Lloyd and Durborow were only arguably supervisors at

the jail, while King was the Ottawa County Sheriff. When addressing a failure to properly train claim, "a supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Meade,* 841 F.2d at 1528 (citing *Hays v. Jefferson County,* 668 F.2d 869, 873-74 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982).) *See City of Springfield v. Kibbe,* 480 U.S. 257, ----, 107 S.Ct. 1114, 1121, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting) (arguing that inadequate police training is actionable under section 1983 only if it amounts to reckless disregard for or deliberate indifference to the rights of persons within the city's domain). "Unless a supervisor has established or utilized an unconstitutional policy or custom, a plaintiff must show that the supervisory defendant breached a duty imposed by state or local law which caused the constitutional violation." *Zatler v. Wainwright,* 802 F.2d 397, 401 (11th Cir.1986) (per curiam) (quoting *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976)).

In Oklahoma, the sheriff is responsible for the proper management of the jail and the conduct of his deputies. *See Meade,* 841 F.2d at 1528; Okla.Stat.Ann. tit. 19, §§ 513 & 547(A) (1962 & 1987 cum. supp.); *see Wolfenbarger v. Williams,* 774 F.2d 358, 365 (10th Cir.1985), cert. denied, 475 U.S. 1065, 106 S.Ct. 1376, 89 L.Ed.2d 602 (1986). "As a result, 'a sheriff is accountable in a § 1983 action whenever a sheriff, in a position of responsibility, knew or should have known of the misconduct, and yet failed to prevent future harm.'" *Meade,* 841 F.2d at 1528. (citing *Anthony v. Baker,* 767 F.2d 657, 666 (10th Cir.1985).

Plaintiff contends that Defendants King, Durborow, and Lloyd failed to provide adequate training and supervision of the Ottawa County jail staff in inmate classification procedures, protocol or policies regarding assigning proper pod placements, and that these training deficiencies were the

proximate cause of Crownover's death.  The Plaintiff provides evidence that the jail nurse, Teresa Horn, did not complete her "jail school" training until after Crownover's death, which was approximately five years into her employment with the Ottawa County Jail.  Plaintiff cites Oklahoma Jail Standard 310:670-5-10 (2) which requires all employees which work in direct contact with prisoners to receive at least 24 hours of training during the first year of their employment. Plaintiff also provides evidence that Nurse Horn did not have any specific training in mental health or mental illnesses and was unaware of the Oklahoma Jail Standards with regards to separation of inmates.  However, in order to succeed on a claim for failure to supervise and train, the Plaintiffs must show that there was a causal connection between the Defendants' failure to train and Crownover's death.  *See Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003); *Zuchel v. City and County of Denver*, 997 F.2d 730, 734-735 (10th Cir. 1993) This is where Plaintiff's claim fails. Although Nurse Horn was delinquent in obtaining her jail school training, this conduct is negligent at best.  Further, Plaintiffs cannot show that had Nurse Horn been through the jail school training or had any additional mental health classes that she would have reacted to Crownover any differently.

As previously discussed, the actions of the jail staff in reaction to the statements and actions of Crownover were appropriate.  Crownover was immediately placed on a 48 hour suicide watch where he was monitored every 15 minutes.  He then talked to Nurse Horn where he told her he was no longer suicidal.  She observed his behaviors and determined him to not be a threat to himself or others.  Whether intentionally because of mental health concerns or otherwise, she continued to keep him separated by placing him in a single cell.  She then allowed him the privilege of interacting with other prisoners during certain specified times.  There are no documented complaints made by

Crownover regarding a need for additional mental health treatment or the need for special terms of confinement. There is no allegation by the Plaintiff that Crownover requested special mental health conditions that the jail was unable to provide due to the lack of knowledge or skill. Any alleged deficient training and/or supervision was not causally linked to Crownover's death and as a result, these claims are hereby **DISMISSED**.

    4.    <u>Qualified Immunity</u>

Defendants King, Duborow, and Lloyd alternatively argue that they are entitled to qualified immunity as to claims against them in their individual capacity. Qualified immunity shields from liability for civil damages those officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Scicluna v. Wells,* 345 F.3d 441, 444 (6th Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In analyzing qualified immunity claims, we employ a sequential analysis prescribed by the Supreme Court in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).[6] First, plaintiffs must show that defendants deprived them of a right protected by the Constitution. *Id.* Second, this right must be so clearly established that a reasonable officer would understand that his or her actions would violate that right. *Id.* To determine whether or not a right was "clearly established" the court must do so "in light of the specific context of the case, not as a broad general proposition." *Greene v. Barber,* 310 F.3d 889, 894 (6th Cir.2002) (quoting *Saucier*, 533 U.S. at 201).

--------

    [6]The Supreme Court in *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009), reconsidered *Saucier's* "rigid order of battle." *Id.* at 815. As a result, district courts may "exercise their sound discretion in deciding which of the two prongs" to address first. *Id.* Given this choice, this Court opts for the *Saucier* approach.

Plaintiff has failed to set forth with sufficiency that there has been any violation of Crownover's Fourteenth Amendment rights by Defendants King, Durborow, or Lloyd; therefore, the Court finds the Plaintiff has failed to meet its burden of establishing a constitutional violation. Although this Court has determined that Plaintiff's §1983 claims fail on the merits, this Court also makes note that Defendants King, Lloyd, and Durborow are entitled to qualified immunity in the suit against them in their individual capacity since the Plaintiff has been unable to establish a violation of Crownover's constitutional rights by any of the three Defendants.

## II.    AMERICANS WITH DISABILITIES CLAIMS

Plaintiff also has claims against Defendants Durborow, King, Lloyd, and the Board for a failure to provide reasonable accommodations under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (hereinafter "ADA").  Title II of the ADA states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Prisons and jails are "public entities" for Title II purposes. 42 U.S.C. § 12131(1); *Pennsylvania Dep't of Corrs. v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215. 210. 524 U.S. 206, 118 S.Ct. 1952, 1954-55, 141 L.Ed.2d 215 (1998)  However, to state a disability discrimination claim under Title II, a plaintiff must allege, among other things, that he "was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity" by reason of his disability. *McGary v. City of Portland,* 386 F.3d 1259, 1265 (9th Cir.2004).

Plaintiff claims that Crownover was a qualified individual with a disability within the meaning of the ADA as a result of his back injury and his mental illness. See 42 U.S.C. §12131(2). Assuming Plaintiff has successfully claimed a disability within the meaning of the ADA, Plaintiff has wholly failed to provide evidence of a failure to accommodate Crownover's disability(s) or a practice of discrimination against Crownover because of his disability(s) on the part of the Defendants.

Plaintiff makes a claim that Crownover's back injuries entitled him to the status of a disabled person under the ADA. However, the record is clear that the jail staff made every accommodation available to ensure that Crownover was comfortable and that he received care for his injured back. Among other things, he was provided a single, lower bunk cell that was handicap accessible. Any allegations that the jailers did not accommodate his back injury related disability clearly fail.

Allegations that his mental illness were not accommodated also fail. Plaintiff claims that the jail staff placed Crownover in a dangerous pod when other, safer accommodations were available, that the staff failed to provide him with appropriate mental health care, that he was improperly monitored, and that the staff failed to detain him safely consistent with his disability. As already determined, the jail staff acted appropriately given the requests made by Crownover and the behavior exhibited by him. Further, although the Plaintiff alleges Crownover was improperly classified by the jail staff, she does not allege that Crownover was denied certain services ***because of his disability*** or denied services that were provided to other prisoners. *See Rashad v. Doughty*, 2001 WL 68708, *1 (10th Cir. 2001); *McNally v. Prison Health Servs.,* 46 F.Supp.2d 49, 58 (D.Me. 1999). As such, Plaintiff has failed to provide this Court with evidence sufficient that Crownover was excluded from or denied the benefits of the jail's services, programs, or activities, or was

otherwise discriminated against by the jail staff by reason of his disability. Plaintiff's ADA claims are hereby **DISMISSED**.

## **CONCLUSION**

For the foregoing reasons, the Court finds that Defendants Randall Lloyd, Terry Durborow, Dennis King, and the Board of County Commissioners of Ottawa County's Motions For Summary Judgment are hereby **GRANTED.**

James H. Payne
United States District Judge
Northern District of Oklahoma